# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP557-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>　　　　Plaintiff-Respondent-Petitioner,<br>　　v.<br>Corey R. Kucharski,<br>　　　　Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 354 Wis. 2d 622, 848 N.W.2d 903)
(Ct. App. 2014 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 7, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 10, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Jean A. DiMotto |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | BRADLEY, J., joined by ABRAHAMSON, J. dissent (Opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

　　For the plaintiff-respondent-petitioner, the cause was argued by *Marguerite M. Moeller*, assistant attorney general, with whom on the briefs was *Brad D. Schimel*, attorney general.


　　For the defendant-appellant, there was a brief by *Matthew S. Pinix*, Milwaukee, and oral argument by *Matthew S. Pinix*.


　　An amicus curiae brief was filed by *Melinda A. Swartz*, Milwaukee, on behalf of the Wisconsin Association of Criminal Defense Lawyers.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP557-CR
(L.C. No. 2010CF652)

STATE OF WISCONSIN : IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent-Petitioner,

  v.

Corey R. Kucharski,

      Defendant-Appellant.

**FILED**

**JUL 7, 2015**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Reversed and remanded.*

¶1 N. PATRICK CROOKS, J. This is a double-murder case that centers on the evidence presented on the question of the defendant's mental responsibility. The circuit court[1] found the defendant responsible. The court of appeals, in a split decision,[2] granted the defendant a new trial under its discretionary authority to reverse convictions in cases where "it appears from the record that . . . it is probable that

---

[1] The Milwaukee County Circuit Court, the Honorable Jean DiMotto presiding.

[2] State v. Kucharski, No. 2013AP557-CR, unpublished slip op. (Wis. Ct. App. May 6, 2014).

1

justice has for any reason miscarried[.]"[3]  We now reverse the grant of a new trial because we conclude that the court of appeals erroneously exercised its discretion, and we remand to the court of appeals for the resolution of the remainder of the claims raised on appeal.

¶2  Corey Kucharski was charged with two counts of intentional homicide for the murders of his parents, which he later said he committed in obedience to voices he heard.  He pleaded not guilty by reason of mental disease or defect (an NGI plea).  He pleaded no contest to the guilt phase of the trial, and waived a jury trial on the responsibility phase.[4]

---

[3] Wisconsin Stat. § 752.35 (2013-14) states

> In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

[4] State v. Magett, 2014 WI 67, ¶¶33-34, 39, 355 Wis. 2d 617, 850 N.W.2d 42, states

> A bifurcated criminal trial consists of two phases: (1) the guilt phase; and (2) the responsibility phase. When a criminal defendant pleads not guilty and not guilty by reason of mental disease or defect, the jury hears evidence relating to the defendant's guilt in the first phase of the trial, and if the jury finds

2

¶3   During the trial, one doctor, Dr. Rawski, testified as the sole witness for the defense; his and other doctors' reports and materials were entered into evidence.  Dr. Rawski testified that it was his opinion to a reasonable degree of medical certainty that Kucharski's symptoms of schizophrenia were so severe on the night he killed his parents that he lacked substantial capacity to appreciate the wrongfulness of his conduct or conform his conduct to the law.  A second doctor who examined him for the defense, Dr. Pankiewicz, was also of the opinion that at the time of the crime, Kucharski was not mentally responsible.  A third expert who examined Kucharski at the State's request, Dr. Jurek, did not come to any different conclusion.  At trial, the State presented no witnesses; it did not dispute that Kucharski was mentally ill but argued that

---

the defendant guilty, the trial proceeds to the second phase. Wis. Stat. § 971.165(1)(a). In the second phase, the jury considers whether the defendant had a mental disease or defect at the time of the crime and whether, "as a result of mental disease or defect the person lacked substantial capacity either to appreciate the wrongfulness of his or her conduct or conform his or her conduct to the requirements of law." Wis. Stat. § 971.15(1).

The responsibility phase described above has evolved over time and has now become close to a civil trial.

. . . [T]he defendant has the burden of proof to show mental disease or defect by the greater weight of the credible evidence, the same burden imposed for most issues in civil trials.

If the NGI plea were tried to a jury, the verdict would have to be agreed to by at least five sixths of the jurors. See Wis. Stat. § 971.165(2).

3

undisputed evidence of Kucharski's actions showed that he did have substantial capacity to appreciate the wrongfulness of what he did and to conform his conduct to the law.

¶4 The circuit court agreed with the State, citing evidence such as Kucharski's statements about expecting punishment for the crime and his decision not to commit suicide or engage in a shootout with police despite reporting that he had heard voices telling him to do so. In light of that evidence, the circuit court found that Kucharski had not met his burden on the issue of responsibility.[5] He was convicted and sentenced to consecutive life sentences.

¶5 Though Kucharski raised several claims on appeal, the court of appeals' analysis focused solely on granting his motion for a new trial under Wis. Stat. § 752.35, the discretionary reversal statute. For purposes of interpreting that statute, justice has miscarried if "there is a substantial probability that a new trial would produce a different result."[6] We have held that "only in exceptional cases" is it appropriate for a reviewing court to exercise its discretion to grant a new trial in the interest of justice.[7]

_____

[5] Wisconsin Stat. § 971.15(3) (stating that the burden on defendant in NGI trial is to prove "to a reasonable certainty by the greater weight of the credible evidence" that he is not responsible).

[6] State v. Murdock, 2000 WI App 170, ¶31, 238 Wis. 2d 301, 617 N.W.2d 175.

[7] State v. Armstrong, 2005 WI 119, ¶114, 283 Wis. 2d 639, 700 N.W.2d 98, State v. Avery, 2013 WI 13, ¶38, 345 Wis. 2d 407, 826 N.W.2d 60, Morden v. Cont'l AG, 2000 WI 51, ¶87, 235 Wis. 2d 325, 611 N.W.2d 659.

¶6   The court of appeals held that there was a substantial probability of a different outcome at a new trial "because [Kucharski] met his burden"[8] of proving by the greater weight of the credible evidence that he was not mentally responsible for the murders.  It found that the evidence in his favor "certainly comprised 'the greater weight of the credible evidence.'"[9]  The dissent would have affirmed the circuit court, citing the well-established proposition that "the credibility of witnesses, the weight of the evidence and the determination of whether the defendant has met his burden" are questions that "are the province of the trial court alone."[10]

¶7   The State argues that the trial court appropriately weighed the evidence in a way that is consistent with prior case law such as State v. Sarinske,[11] which holds that a trier of fact is not required to accept the opinion of an expert, even if uncontradicted.  The State argues that the court of appeals "wholly ignore[d] this requirement and instead substitute[d] its

---

[8] State v. Kucharski, No. 2013AP557-CR, ¶35, unpublished slip op. (Wis. Ct. App. May 6, 2014).

[9] Id.

[10] Id., ¶45.

[11] State v. Sarinske, 91 Wis. 2d 14, 48, 280 N.W.2d 725 (1979).

judgment for that of the fact-finder . . . ."[12] Kucharski argues that "[t]he very nature of the test for miscarriage of justice necessitates substitution of the appellate court's judgment for that of the factfinder" and that in fact an appellate court should have "unfettered discretion to review the record without deference to the factfinder's conclusions."

¶8 We uphold discretionary rulings unless they are reached under an incorrect view of the facts or the law. In State v. D'Acquisto[13] we stated,

> The appropriate standard of review for assessing the propriety of the court of appeals' [discretionary ruling] is that this court will uphold the court's discretion if its decision is made on appropriate facts and the correct law and thus is one which a court reasonably could have reached. If it is demonstrated that the court of appeals made a discretionary order, . . . based upon a mistaken view of the law, we will ordinarily reverse that order.

In this case, that is what happened.[14] The reason given by the court of appeals in this case for invoking the rarely used power of discretionary reversal was that the defendant had "met his

---

[12] The State also argues that this court should "tighten the requirements for granting a new trial on mental responsibility under the miscarriage-of-justice prong of § 752.35" by adding a requirement that "error, counsel's misfeasance, or some form of unfairness infected the defendant's trial." We are confident that the existing rules are adequate and decline the invitation to write additional requirements into the statute.

[13] State v. D'Acquisto, 124 Wis. 2d 758, 762, 370 N.W.2d 781 (1985) (citations omitted).

[14] Even under this deferential standard, it is not incorrect for this court to reverse a ruling based on mistake of law. It would not be proper to leave undisturbed, under the guise of a deferential standard of review, a mistaken application of the law. See Dissent, ¶3.

burden," which is going too far for a reviewing court on a question of fact. Further, the sole reason given for the discretionary reversal was that improperly reached conclusion. The framework for reviewing evidentiary challenges must recognize "established rules of jurisprudence designed to protect the sanctity of findings of fact . . . ."[15] It is thus error for a reviewing court to set aside findings of fact without evaluating them under the proper standard of review.

¶9 The proper standard of review for appellate review of whether a party has met his burden on the matter of mental responsibility is uncontroversial and well established in both Wisconsin law and federal law: whether a person has met his or her burden on the question of mental responsibility is a question of fact, subject to a clearly erroneous standard of review.[16]

---

[15] State v. Hintz, 200 Wis. 636, 642, 229 N.W. 54 (1930).

[16] Wisconsin cases that support this proposition include State v. Leach, 124 Wis. 2d 648, 660, 370 N.W.2d 240 (1985); State v. Sarinske, 91 Wis. 2d 14, 48, 280 N.W.2d 725, (1979); Pautz v. State, 64 Wis. 2d 469, 476, 219 N.W.2d 327 (1974); Kemp v. State, 61 Wis. 2d 125, 137, 211 N.W.2d 793 (1973); State v. Bergenthal, 47 Wis. 2d 668, 685, 178 N.W.2d 16 (1970);; State v. Ryan, 2000 WI App 47, ¶16, 233 Wis. 2d 273, 610 N.W.2d 229; and State v. Murdock, 2000 WI App 170, ¶3, 238 Wis.2d 301, 617 N.W.2d 175..

Federal cases that have stated this standard include United States v. Waagner, 319 F.3d 962, 964 (7th Cir. 2003); United States v. Barton, 992 F.2d 66, 68 (5th Cir. 1993); and United States v. Smeaton, 762 F.2d 796, 798-99 (9th Cir. 1985). A law review article summarizing the development of appellate standards for review of federal insanity defense cases described two of the key cases as follows:

7

¶10 The court of appeals' holding reveals its error: it simply performs a new weighing of the evidence and then states outright that Kucharski "met his burden" and that the evidence "certainly comprised" the required burden of proof-- determinations that are unquestionably issues of fact, not law. By way of illustration, in State v. Hintz,[17] a case that considered a sufficiency of the evidence challenge and discretionary reversal, we acknowledged, as we remanded for a new trial, that the ultimate question of whether the evidentiary burden was met would be one for the trier of fact and not for the reviewing court: Noting that "it is the function of the [trier of fact] to resolve this doubt," we remanded so that "the

---

> In United States v. Barton in 1993, the Fifth Circuit addressed whether the Jackson sufficiency of the evidence standard applied in situations when insanity is an affirmative defense, and the defendant, rather than the prosecution, has the burden of proof. . . . After recognizing the implications of shifting the burden of proof to the defendant, the court noted that slight modification to the sufficiency of the evidence standard was necessary. Accordingly, the Barton court stated that it "should reject the jury verdict only if no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence." . . .
>
> As in Jackson, the Barton court noted that appellate courts are not to supplant the role of the jury as fact finders when reviewing the sufficiency of the evidence supporting a conviction.

Kevin Thompson, Criminal Appellate Procedure——Insanity Defense—— the Proper Standard of Appellate Review When Reviewing A Jury Decision on Sanity, State v. Flake, 88 S.W.3d 540 (Tenn. 2002), 70 Tenn. L. Rev. 1213, 1224-25 (2003).

[17] Hintz, 200 Wis. at 642.

question of defendant's guilt should be passed upon by another jury . . . ."[18]

¶11 Applying the proper standard of review and not disturbing the factual findings of the circuit court concerning the burden of proof because they are not clearly erroneous, we conclude that the court of appeals erroneously exercised its discretion. In this case the only reason given by the court of appeals for the new trial in the interest of justice was that court's improper de novo weighing of the evidence. When the evidence is reviewed under the proper standard, there is not a probability of a different result on retrial such that a new trial in the interest of justice is warranted.

¶12 We therefore reverse the grant of a new trial under Wis. Stat. § 752.35 and remand to the court of appeals for the resolution of Kucharski's remaining unaddressed claims.[19]

## I. BACKGROUND

¶13 Kucharski called 911 after midnight on a February night in 2010 to request a coroner. He told the 911 operator that his parents were dead, named the gun he had used to kill them, and was clear in communicating that there was no need to send medical assistance. When police arrived, he surrendered

---

[18] Id.

[19] Kucharski argued at the court of appeals that the trial court erred in its application of Wis. Stat. § 971.15, that the trial court's conclusions regarding mental responsibility lack support in the record, and that he was entitled to a new trial due to ineffective assistance of counsel. See State v. Kucharski, No. 2013AP557-CR, unpublished slip op., ¶31, n.2 (Wis. App., May 6, 2014).

9

without incident.  Police found Kucharski's father and mother in the home, dead of multiple gunshot wounds.

¶14 Once in police custody, Kucharski invoked his right to counsel when asked specifics about the shootings.  When he was questioned by detectives, after he received his Miranda warnings, Kucharski stated, "[A]s far as the statement about most of what happened that evening and I'd rather have a lawyer here for that."  When the detective reiterated his right to do that, Kucharski stated, "If you want to ask me any questions about my background or any, any other questions, fine. . . . I know you want to talk about the evening but I still rather have somebody here before I start answering questions about that night."[20]

¶15 He willingly talked to investigators without counsel present about his history, prior drug use, alcohol use, and his experience of hearing voices, which he said began five years earlier after a period of extensive drug use.  He said he

---

[20] Dr. Rawski, the doctor who testified at the trial, acknowledged on direct examination that Kucharski

> clearly . . . recognized the illegality of homicide and recognized that there would be, in his term, quote, repercussions, unquote, that he did not expect to have to deal with when planning his – the executions because he expected to have been killed by police afterwards and – and engaging in a shootout with them. His – His decision to invoke his right [to counsel] is based on his knowledge that he would be in legal trouble, that he was arrested by police and that he was criminally charged. He was not so out of touch with reality that he didn't know he was in jail or that he didn't know he was arrested or that he didn't know what he had actually done.

continued hearing the voices after he stopped using drugs. The voices he heard told him to do specific things and berated him for certain mistakes. He also disclosed that he had experienced other auditory distortions such as hearing another person's voice while a person was speaking to him. He drank heavily, which he said was an effort to quiet the voices.[21] He had held jobs in prior years both in Wisconsin and in other states. In 2005 he had returned to his parents' Milwaukee home, where he spent his time increasingly isolated, drinking daily and amassing a gun collection. He sought disability benefits for a medical condition but gave no indication at that time that he was experiencing mental health problems. He was never treated for mental health issues and never told anyone that he was experiencing them.

¶16 At trial, Dr. Rawski testified that Kucharski's account of the evening was that he had been present at an argument between his parents in the early evening. Afterward, he recalled, he had heard voices saying, "[J]ust [expletive] kill them, give them what they want . . . ." At that point, he

---

[21] Dr. Rawski's written report, which is in the record, also contained Kucharski's account of the evening of the murders. He stated that he had been drinking beginning in the afternoon but did not specify the number of drinks he had. He did not consider himself intoxicated after he awoke from a nap. In testimony, Dr. Rawski noted that Kucharski "was not assessed to be intoxicated by alcohol by the police afterwards." It was Dr. Rawski's conclusion that "[t]his is a planned – executed set of executions in a[n] organized fashion driven by motive, driven by – by delusion and hallucinations, in my opinion, not by disinhibition and behavior by alcohol dependence." The circuit court made no contrary findings regarding the role of alcohol or drug use in Kucharski's health or in the homicides.

had gone to his bedroom to sleep. He had awakened a couple of hours later and had heard a clear voice telling him to "end it" —— to kill his parents and die while engaging in a shootout with police when they arrived. At that point, he had gone downstairs and confronted his father in the kitchen and shot him. He had stepped into another room and shot his mother, apparently as she was coming toward him. Kucharski's father was shot 10 times; his mother was shot four times. He had waited a couple of hours before placing the 911 call. He stated that in the past his father had stated that if he had a medical emergency, he wished for Kucharski to delay an hour before calling 911 so that there would be no possibility of resuscitation. He stated he did so in this instance in keeping with his father's wishes.

¶17 Kucharski was charged with two counts of first-degree intentional homicide while using a dangerous weapon.[22] He entered an NGI plea under Wis. Stat. § 971.15.

¶18 Kucharski waived his right to trial on the issue of guilt, instead pleading no contest. The issue of mental responsibility was tried to the court after he waived his right to a jury. The three doctors who examined him all concluded in their reports that, as a result of his schizophrenia, Kucharski "lacked substantial capacity either to appreciate the wrongfulness of his . . . conduct or conform his . . . conduct

---

[22] The statutes defining first degree intentional homicide by use of a dangerous weapon are Wis. Stat. §§ 940.01(1)(a), 939.50(3)(a), and 939.63(1)(b).

12

to the requirements of law," that he satisfied both requirements of the test, and that he was therefore not mentally responsible.

¶19 The circuit court found that Kucharski had failed to meet his burden of proving that he was not responsible. The circuit court concluded that Kucharski did suffer from schizophrenia; however, it also concluded that the experts' opinions that he was not mentally responsible were speculative and insufficient to overcome other evidence from which it could be inferred that he appreciated the wrongfulness of his conduct and had the capacity to conform his conduct to the requirements of the law.

¶20 As to the question concerning his ability to appreciate the wrongfulness of his conduct, the circuit court stated, "[T]here are indications, very near the point in time that the Defendant committed these crimes, that he understood they were wrongful, illegal." For example, the court said, he had expressed the knowledge that he needed a lawyer and would be "rotting in jail" for the killings.

¶21 As to the issue of whether he could conform his conduct to the requirements of the law, the circuit court stated that Kucharski had heard

> command voices about killing himself, and he did not follow through with that before or after he killed his parents. . . . [Y]et he doesn't respond to the command voice, especially the derogatory one that he was the cause of the fight, and he should kill himself and so on, whether directly, or through a shootout with the police.

The court subsequently stated, "I'm finding him legally responsible because I'm not persuaded beyond a level scale. . . . It's not tipping, even slightly, that he lacked substantial capacity to conform his conduct to the law." The circuit court observed that "the basis of [the experts'] opinions . . . is that they're speculating about what happened."

¶22 The court of appeals reversed, and the State petitioned for review, which we granted.

## II.  STANDARD OF REVIEW

¶23 "This court does not normally review a discretionary decision of the court of appeals. However, when [it] do[es] review a discretionary act of the Court of Appeals, [it] review[s] the decision as [it] would any other exercise of discretion."[23]  "[A] court erroneously exercises its discretion when it fails to set forth its reasoning and the facts of record do not support its decision. Further, a court erroneously exercises its discretion when it proceeds under a mistaken view of the law."[24]  "This court has held that it is an erroneous exercise of discretion for the court of appeals . . . to shortcut [established] procedures . . . when there is no

---

[23] _Raz v. Brown_, 2003 WI 29, ¶14, 260 Wis. 2d 614, 660 N.W.2d 647.

[24] _State v. Evans_, 2004 WI 84, ¶20, 273 Wis. 2d 192, 682 N.W.2d 784, abrogated on other grounds by _State ex rel. Coleman v. McCaughtry_, 2006 WI 49, 290 Wis. 2d 352, 714 N.W.2d 900 (citations omitted).

14

apparent reason for doing so."[25]    Reversals in the interest of justice should be granted only in exceptional cases.[26]

¶24 "The credibility of the witnesses is properly the function of the jury or the trier of fact, in [cases where the right to a jury is waived,] the trial judge. It is only when the evidence that the trier of fact has relied upon is inherently or patently incredible that the appellate court will substitute its judgment for that of the fact finder, who has the great advantage of being present at the trial."[27]

### III. DISCUSSION

#### A. REVERSAL UNDER WIS. STAT. 752.35 WAS ERROR BECAUSE REVERSAL WAS BASED ON AN IMPROPER WEIGHING OF THE EVIDENCE WITHOUT APPLYING THE CORRECT STANDARD

¶25 Two of the remedies that can be sought by a defendant following conviction are an outright reversal of a conviction and a reversal and remand.  An outright reversal can be based on various grounds, including a conclusion that the evidence is insufficient as a matter of law; this results in no retrial.[28]  A reversal and remand for a new trial may be granted for various reasons, including when it is probable that justice has

---

[25] Id.

[26] State v. Armstrong, 2005 WI 119, ¶114, 283 Wis. 2d 639, 700 N.W.2d 98, State v. Avery, 2013 WI 13, ¶38, 345 Wis. 2d 407, 826 N.W.2d 60.

[27] Gauthier v. State, 28 Wis. 2d 412, 416, 137 N.W.2d 101 (1965).

[28] State v. Hayes, 2004 WI 80, ¶40, 273 Wis. 2d 1, 681 N.W.2d 203.

miscarried and justice requires that the evidence be presented to a new trier of fact for a verdict.[29]

¶26 We focus on the reason given by the court of appeals that it was probable that there would be a different outcome on retrial. It was clearly a reweighing of the evidence. The court of appeals stated:

> We agree with Kucharski that there is a substantial probability that a new trial would produce a different result <u>because he met his burden</u> under Wis. Stat. § 971.15(3). <u>See</u> <u>Murdock</u>, 238 Wis. 2d 301, ¶31. The evidence showing that Kucharski lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was, as we will discuss more fully below, very strong, and <u>certainly</u> comprised "the greater weight of the credible evidence."[30]

¶27 It is well established that factual findings are upheld unless they are clearly erroneous.[31] It is also well established that "[t]he question of <u>whether an accused has or has not met this burden [of proving that the accused was not mentally responsible for a crime] is one of fact</u>, not one of law

---

[29] <u>Hintz</u>, 200 Wis. at 642 ("Whatever doubts we may entertain concerning the justice of this verdict, our power to disturb it is limited by established rules of jurisprudence designed to protect the sanctity of findings of fact, a function which constituted society has committed to the jury.")

[30] <u>State v. Kucharski</u>, No. 2013AP557-CR, unpublished slip op., ¶35 (Wis. Ct. App. May 6, 2014) (emphasis added).

[31] <u>State v. Novy</u>, 2013 WI 23, ¶22, 346 Wis. 2d 289, 827 N.W.2d 610 ("We will uphold a circuit court's findings of fact unless they are clearly erroneous.")

for this court on appeal."[32] When the proper framework is applied to an evaluation of the factual findings, the findings here must be upheld because there is no basis for saying that the findings are clearly erroneous.

¶28 There are four points the court of appeals identified as the basis for its conclusion.

¶29 The first point was that "there is no dispute that Kucharski was in fact suffering from schizophrenia when he killed his parents."[33] The circuit court found that to be proved and identified the real focus of the case, stating,

> I don't think there's even a doubt, much less a reasonable doubt, that Mr. Kucharski suffered from a mental illness at the time that he committed these crimes, and the name of that mental illness is schizophrenia. The close call is whether he lacked substantial capacity to conform his conduct to the law or to understand the wrongfulness of his conduct.

The court later repeated, "There's no question that he suffered from schizophrenia at the time that he engaged in that planned, purposeful, intentional behavior to shoot his parents to death." While this fact is listed as a reason for the court of appeals' reversal, the issue of an existing mental illness was not the basis of the circuit court's original finding of fact in support of conviction, and the conclusion that Kucharski suffered from mental illness was not an obstacle to the circuit court's decision.

---

[32] _State v. Sarinske_, 91 Wis. 2d 14, 47-48, 280 N.W.2d 725 (1979) (emphasis added).

[33] _Id._, ¶36.

¶30 The second point was that "the expert testimony was uncontroverted."[34] It is certainly accurate to state that the doctors who examined Kucharski came to the opinion that the schizophrenia rendered him unable to appreciate the wrongfulness of his conduct and to conform his conduct to the law. But the opinions of experts are not dispositive. The trier of fact retains the sole responsibility for determining whether the defendant has met his burden. Further, we have explicitly stated that an expert's opinion, "even if uncontradicted need not be accepted by the [trier of fact]."[35] This is especially true where "the defense doctors relied substantially on information provided by [the defendant]."[36] That is precisely the situation in Kucharski's case. As Dr. Rawski, the testifying doctor, acknowledged, he had conducted a three-and-a-half-hour meeting with Kucharski, but he was missing much of the context he normally relies on for an NGI opinion:

> In my NGI evaluation we have some glaring absences of information that we typically rely upon[,] one of which is the statements of the victim or witnesses and there are none in this particular situation. Secondly – I mean there are – there are victims but there are no statements from them about the incident.
>
> Secondly we do not have a – a history of psychiatric evaluations over the course of time indicating the presence of mental illness and the supporting details that we look for to examine comparable contexts for similar behavior and symptoms as well, so that's absent as well, and so the evaluation and the NGI

---

[34] Id., ¶37.

[35] Sarinske, 91 Wis. 2d at 47-48.

[36] Id. at 49.

opinion, one way or another, is going to be primarily based largely upon the evidence such as the jail observations afterwards, the police observations afterwards, the random statements by neighbors who did not know Mr. Kucharski very well because of his very isolated lifestyle and based upon the limited information from that disability report.

¶31 Sarinske also involved a mental responsibility trial. Although the State in that case did put on an expert witness who contradicted the defense witnesses, Sarinske stated that a trier of fact may reject the opinions of an expert, even when there is no testimony to the contrary, when the basis of the expert's opinion is information substantially derived from the defendant. As Sarinske stated:

> [T]he jury is free to disbelieve the defense witnesses entirely, and even if the State declines . . . to present any experts in rebuttal, the accused may fail to satisfy his burden of affirmatively proving that he was suffering from mental disease. Because the defense doctors relied substantially on information provided by [the defendant], the basis of their opinion and their diagnoses could be questioned by the jury on this ground alone.[37]

¶32 The source of virtually all of the reports and interviews came down to Kucharski's own version of events and perspective. The evidence of mental health issues that preceded the murders included the defendant's own account that he had begun hearing voices about five years earlier and several pages of handwritten notes found in his room that he said were his attempts over a period of a year to document the comments the voices made. Dr. Rawski described the notes as "very bizarre

---

[37] Id. at 48-49 (citations omitted) (emphasis added).

and inexplicable." Therefore, under Sarinske, the fact that the expert reports were uncontroverted is not dispositive. The circuit court had no obligation in its role as the trier of fact to accept the conclusion of the experts who relied on Kucharski for their reports.

¶33 The third point was that "there was a complete lack of evidence of alternative explanations for Kucharski's behavior."[38] The court of appeals cited to State v. Murdock, apparently for the implied proposition that absent a rational explanation for behavior, it may be inferred that the explanation is that the person lacked capacity to appreciate the wrongfulness of his conduct or conform it to the law.[39] However, it cites to no

---

[38] State v. Kucharski, No. 2013AP557-CR, unpublished slip op. ¶40 (Wis. Ct. App. May 6, 2014).

[39] Murdock, 238 Wis. 2d 301, ¶44, made its statement in the context of setting forth the facts in that case:

> The evidence presented at trial presents no explanation for why Murdock would stab Grams approximately twenty times in order to steal his car, but then park the car in front of the Smiths' house, drag Grams out of the back of the car and leave him in the Smiths' front yard. Although Murdock demanded money from the Smiths, tried to prevent Shirley Smith from calling the police, and fled to the basement when the police came in the house after him, viewed as a whole, his behavior does not appear as purposeful as the State contends. After demanding money from the Smiths, Murdock "went berserk stabbing" them. When the first police officer arrived, Murdock was sitting on the Smiths' front steps near Grams's dead body. Murdock did not try to flee, but instead stood up and sat back down on the steps, and went in and out of the house several times. He even opened the door to the Smiths' house so that the police could come inside.

(emphasis added).

authority for the proposition that a rational explanation must be offered for a criminal act. Indeed, that approach would appear to shift the burden of proof on an NGI plea to the State. As the circuit court noted,

> I think both Dr. Pankiewicz and Dr. Rawski opined that they could not find evidence of a rational, alternative motive for the Defendant's behavior. I don't disagree with that. I think shooting your parents to death with a gun, is conduct that we might not find quote unquote rational.

¶34 The fourth point was that the court of appeals "conclude[d] that evidence that Kucharski appeared to understand the legality of his actions and did not commit suicide as the voices directed does not mean that he was generally able to control his behavior or appreciate its wrongfulness at the time of the shooting."[40] This is the crux of the court of appeals' reasoning, and it is a bare reweighing of what the evidence means, which is not permitted by a reviewing court.

¶35 Kucharski argues that "[t]he very nature of a test for a miscarriage of justice necessitates substitution of the appellate court's judgment for that of the factfinder." That is not correct.

¶36 To agree would allow any sufficiency of the evidence claim to be converted to an interest of justice claim, thereby evading the stringent standard for reviewing findings by the trier of fact. That is contrary to the law. It would also be an inappropriate use of the power to grant discretionary

---

[40] State v. Kucharski, No. 2013AP557-CR, unpublished slip op. ¶41 (Wis. Ct. App. May 6, 2014).

21

reversals. Put a different way, a reversal in the interest of justice is not intended to put the reviewing court in the shoes of the trier of fact in a way that is otherwise not permitted. It is not permitted to review factual findings without employing the correct standard of review.[41] The reviewing court in such a case may go only so far as to say that it is "probable" that justice has miscarried and that it concludes that "the question of defendant's guilt should be passed upon by another jury . . . . ."[42]

---

[41] The approach Kucharski argues for, that an appellate court should have "unfettered discretion to review the record without deference to the factfinder's conclusions," is in conflict with the proper standard of review; it would turn appellate courts into simple do-overs. However, it is inaccurate to say that appellate courts are precluded by that standard of review from evaluating the evidence. It is, in fact, the kind of evaluating of evidence that appellate courts routinely do when they are reviewing questions of fact. Contrary to the dissent's assertions, we apply settled law on questions of fact and appellate standards of review here and make no new law.

[42] Hintz, 200 Wis. 636, 637. The court of appeals imprecisely characterized the conclusion of this court in regard to the Kemp case when it stated, "The supreme court reversed Kemp's conviction, concluding that he lacked the capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law." State v. Kucharski, 2014 WI App 71, ¶42, 354 Wis. 2d 622, 848 N.W.2d 903 (emphasis added). That is not correct. In Kemp v. State, 61 Wis. 2d 125, 137, 211 N.W.2d 793 (1973), this court stopped short of making that factual finding and merely remanded for a finding on that question to be made by a second trier of fact. Kemp, 61 Wis. 2d at 137 ("We believe the weight of the testimony is such that justice has probably miscarried and that it is probable a new trial will result in a contrary finding.")

22

¶37 The court of appeals considered the facts of this case comparable to those of Kemp v. State,[43] in which the defendant, a Vietnam veteran who had been treated extensively for war-related mental health problems, was granted a new trial after being convicted of shooting and killing his wife. The court of appeals said that "Kemp supports our decision to reverse . . . . " We disagree. In that case, there was evidence of pervasive and debilitating mental illness that had resulted in inpatient and outpatient treatment of the defendant over a period of years prior to the shooting.[44] There was testimony from neighbors about the absence of any indication that Kemp would have intentionally killed her.[45] The court of appeals also noted that in this case, unlike in Kemp, there were no experts who concluded Kucharski was mentally responsible for the killings; therefore, it concluded that reversal in this case was even more justified than in Kemp, where the experts consulted had come to varying conclusions.

¶38 Where a defendant seeks to mitigate punishment for a crime on the basis of mental disease or defect, it is highly relevant to consider the kind of external corroborating evidence that existed prior to the charged offense. In Kemp this court recognized this when it noted, "The record clearly reveals that this is not a case where the question of the defendant's mental

---

[43] Kemp, 61 Wis. 2d at 137.

[44] Id. at 134.

[45] Id.

condition was asserted for the first time after the act or the commencement of a criminal prosecution under circumstances that might suggest the defense is a self-serving afterthought to avoid legal responsibility."[46]

¶39 Kucharski's, in contrast, is exactly that type of case. The expert reports dismissed concerns that Kucharski was malingering, but, contrary to the court of appeals' implication, those opinions are not dispositive. The trier of fact was not bound to accept those conclusions in light of evidence such as Kucharski's extraordinarily careful statements to law enforcement, from which contrary inferences could be drawn.

¶40 It is clear from Kemp that the court placed great weight on the evidence of the prior corroborated mental health problems. This single distinguishing fact is enough to make it unreasonable to view Kemp as supportive of a reversal on these facts.

¶41 Kemp is instructive in that it also illustrates the principle that other claims of error must be addressed before moving to a consideration of whether a case is so exceptional it warrants reversal in the interest of justice.[47] Before beginning its analysis of the interest of justice claim, the court addressed one claimed evidentiary error and then noted, "The defendant has asserted other procedural errors. We have reviewed

---

[46] Id. at 137.

[47] Where there is no identified error in the circuit court, a defendant will have a more difficult time showing reversal is warranted in the interest of justice.

24

them and find no error."[48] As noted above, reversals under Wis. Stat. § 752.35 are rare and reserved for exceptional cases.[49]

¶42 In Avery, this court further noted that a determination that a case was the exceptional case that warranted such a reversal must be supported by an analysis setting forth the reasons for the determination.[50]

¶43 We have similarly held that taking "shortcuts" where a particular analysis is prescribed will be deemed error: "This court has held that it is an erroneous exercise of discretion for the court of appeals . . . to shortcut [established] procedures . . . when there is no apparent reason for doing so."[51] In an exceptional case, after all other claims are weighed and determined to be unsuccessful, a reviewing court may determine that reversal is nevertheless appropriate under Wis. Stat. § 752.35.

### B. THE FACT-FINDING OF THE TRIER OF FACT THAT KUCHARSKI DID NOT MEET HIS BURDEN IS NOT CLEARLY ERRONEOUS

¶44 A reviewing court upholds the findings of fact by a trier of fact unless they are clearly erroneous. The determination of whether a party has met his or her burden is a

---

[48] Kemp, 61 Wis. 2d at 136.

[49] Armstrong, 283 Wis. 2d 639, ¶114; Avery, 345 Wis. 2d 407, ¶38; Morden, 235 Wis. 2d 325, ¶87.

[50] Avery, 345 Wis. 2d 407, ¶59 (holding that "the court of appeals erroneously exercised its discretion when it failed to properly analyze whether this was an exceptional case that entitled Avery to a new trial in the interest of justice.")

[51] Id.

matter of fact, not law.[52]    Therefore, unless it is clearly erroneous, the court of appeals is obligated to uphold the finding that Kucharski did not meet his burden of showing by the greater weight of the credible evidence that he was not mentally responsible for the crimes.

¶45  We agree with the court of appeals' dissent in this case:

> The trial court gave reasoned explanations for its findings on the second prong of mental responsibility. It found that Kucharski was able to appreciate the wrongfulness of his conduct, quoting the experts that Kucharski thought killing his parents was the right thing to do and quoting Dr. Rawski as saying Kucharski knew right after the shooting that he needed a lawyer. And the trial court found that Kucharski failed to meet his burden of showing that he lacked the substantial capacity to conform his conduct to the rules of law because he obeyed part of what the voices commanded and chose not to obey other parts . . . .
>
> The trial court drew proper inferences from the evidence and found those inferences more reliable than the doctors' opinions as to the second prong of mental responsibility. The trial court explained that it distrusted the self-report basis for the doctors' opinions. . . .
>
> In questioning the basis for the experts' opinion, the trial court was engaging in the same evidence weighing process that the Wisconsin Supreme Court approved in Sarinske.[53]

### IV.  CONCLUSION

¶46 Applying the proper standard of review and not disturbing the factual findings of the circuit court concerning

---

[52] Sarinske, 91 Wis. 2d at 48.

[53] State v. Kucharski, No. 2013AP557-CR, unpublished slip op. ¶¶47-49 (Wis. Ct. App. May 6, 2014).

26

the burden of proof because they are not clearly erroneous, we conclude that the court of appeals erroneously exercised its discretion. In this case the only reason offered by the court of appeals for the new trial in the interest of justice was that court's improper de novo weighing of the evidence concerning the burden of proof on the NGI plea of the defendant. When the evidence is reviewed under the proper standard, there is not a probability of a different result on retrial such that a new trial in the interest of justice is warranted.

¶47 We therefore reverse the grant of a new trial under Wis. Stat. § 752.35 and remand to the court of appeals for the resolution of Kucharski's remaining unaddressed claims.

*By the Court.*—Reversed and remanded.

¶48 ANN WALSH BRADLEY, J. (dissenting). I agree with the majority that a reviewing court's discretionary power of reversal should be sparingly exercised. Majority op., ¶¶5, 42. I part ways with the majority's analysis, however, because it formulates a new rule that arbitrarily limits our powers. The majority declares that a reviewing court cannot base a decision to reverse in the interest of justice on a reassessment of the evidence. Id., ¶¶10, 26.

¶49 Its decision to limit a reviewing court's discretionary powers in this manner is extraordinary. It conflicts with the expressed purpose of the discretionary reversal statute and contradicts decades of precedent. Because this court's discretionary powers of reversal are coterminous with the powers of the court of appeals, the majority inexorably limits the discretionary powers of both.

¶50 The exercise of discretion is a core judicial function. The court of appeals' decision to reverse in the interest of justice is an exercise of discretion entitled to a deferential standard of review. Even if we may disagree with the result, this court "will uphold the discretion of a court [it is] reviewing if the decision made on appropriate facts and the correct law is one which a court reasonably could have reached." McConnohie, 113 Wis. 2d 362, 370, 334 N.W.2d 903 (1983).

¶51 I conclude that the court of appeals decision to reverse in the interest of justice should be upheld. Because the court of appeals' discretionary decision was based on

1

appropriate facts and the correct law, and was a decision that a court could reasonably reach, I respectfully dissent.

I

¶52 The majority errs by creating a new rule that limits the discretion of reviewing courts: a reviewing court's decision to reverse in the interest of justice cannot be based on a reassessment of the evidence. See Majority op., ¶34. This arbitrary limit on a reviewing court's discretion conflicts with the expressed purpose of the discretionary reversal statute.

¶53 For over a century, appellate courts in Wisconsin have had the power to reverse judgments in the interest of justice. Since its initial codification in 1913, this power has been broadly stated:

> In any action or proceeding brought to the supreme court by appeal or writ of error, if it shall appear to that court from the record, that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the supreme court may in its discretion reverse the judgment or order appealed from, regardless of the question whether proper motions, objections, or exceptions appear in the record or not, and may also, in the case of reversal, direct the entry of the proper judgment or remit the case to the trial court for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure . . . as shall be deemed necessary to accomplish the ends of justice.

Wis. Stat. § 2405m (1913). The statute's enactment was part of a movement to simplify the law so that technicalities would not be permitted to thwart justice. See Marvin B. Rosenberry, J., Recent Progress in Judicial Administration and Procedure in Wisconsin, 5 Marq. L. Rev. 3, 4-5, 9 (1920).

2

¶54 The statute has subsequently gone through slight revisions and has been renumbered as Wis. Stat. § 751.06. The substance, however, is substantially the same:

> In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

Wis. Stat. § 751.06.

¶55 When the court of appeals was created in 1978, the legislature enacted a nearly identical statute, Wis. Stat. § 752.35, granting the same power of discretionary reversal to the court of appeals.[1] _State v. Schumacher_, 144 Wis. 2d 388, 399-400, 424 N.W.2d 672 (1988). Because Wis. Stat. § 751.06 and

---

[1] Wisconsin Stat. § 752.35 provides:

> Discretionary reversal. In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

3

Wis. Stat. § 752.35 share the same language, this court has determined that "the power of reversal under these statutes is identical." Vollmer v. Luety, 156 Wis. 2d 1, 19, 456 N.W.2d 797 (1990); see also State v. Avery, 2013 WI 13, ¶38 n.17, 345 Wis. 2d 407, 826 N.W.2d 60 ("The discretionary reversal power of this court and the court of appeals is coterminous.").

¶56 The language used in Wis. Stat. §§ 752.35 and 751.06 indicates that the legislature intended the discretionary reversal power of reviewing courts to cover a broad range of situations. For example, they both permit reversal when "it is probable that justice has for any reason miscarried." Wis. Stat. §§ 751.06, 752.35 (emphasis added). Further, under the statutes, neither court's ability to reverse in the interest of justice is limited to proper motions or objections appearing in the record. Id. "[The statutes'] very breadth, as a matter of statutory interpretation, indicates that they are meant to provide courts with the opportunity to exercise their discretion without constraint." Monica Mark, A Fearless Search for the Truth No Longer: State v. Henley and Its Destructive Impact on New Trials in the Interest of Justice, 2012 Wis. L. Rev. 1367, 1386.

¶57 This court has explained that "[t]his broad discretion enables [the court of appeals] to achieve justice in individual cases." Vollmer, 156 Wis. 2d at 21; see also State v. Mathis, 39 Wis. 2d 453, 458, 159 N.W.2d 729 (1968) ("The statute is intended as an emergency exit for the probably innocent."). Considering that "[t]he function of the judiciary

4

is the administration of justice," In re Kading, 70 Wis. 2d 508, 518, 235 N.W.2d 409 (1975), the breadth of the discretionary reversal statute is appropriate.

¶58 By determining that appellate discretion does not extend to a reassessment of the evidence, the majority erroneously constricts the discretionary power of reviewing courts. It removes a swath of cases from review, opening the door for the potential of an unaddressed and unreviewable miscarriage of justice. The majority's determination to limit reviewing courts' discretion runs counter to the broad language of the statute and its expressed purpose "to accomplish the ends of justice." Wis. Stat. § 752.35.

¶59 The majority opinion is further flawed because it contradicts decades of Wisconsin precedent permitting reviewing courts to reverse in the interest of justice when the evidence raises great doubts about whether the state has met its burden, suggesting that justice has miscarried. See State v. Fricke, 215 Wis. 661, 667, 255 N.W. 724 (1934) ("Occasionally when such grave doubts exist in our minds regarding guilt of a defendant as to make us conscientiously believe that justice probably has miscarried, we exercise the authority specifically given to us by section 251.09 [subsequently renumbered as Wis. Stat. § 751.06], and reverse the judgment for a new trial.").

¶60 This court has oft recognized that reviewing courts may reassess the evidence when considering whether justice has miscarried. For example, in Hintz, 200 Wis. 636, 229 N.W.2d 54 (1930) the court's decision to reverse in the interest of

5

justice was based on an assessment of the evidence. In that case, the court reviewed a conviction for obtaining money under false pretense. It observed that an essential element of the charge was the intent to defraud. The court recited the evidence relating to intent, which strongly favored the defendant, and acknowledged that weighing this sort of evidence is typically a jury function. Id. at 641. However, the court's analysis did not stop there. After stating that the "evidence leaves the question of defendant's intent to defraud in the greatest of doubt," the court concluded that "[w]hile it is the function of the jury to resolve this doubt, it seems probable to us that justice has miscarried by the verdict rendered. Under such circumstances it is within our power to order a new trial." Id. at 642. Accordingly, the court reversed the conviction and remanded the cause for a new trial. Id.

¶61 Similarly, in Hughes v. State, 219 Wis. 9, 261 N.W. 670 (1935), the court's determination that justice had been miscarried was based on its review of the evidence. There, although the court observed that sufficient evidence had been presented to raise a jury question, it expressed doubts regarding the witness's version of events: "the story of the complaining witness is inherently improbable." Id. at 11-12. It further described the story presented as "doubtful" and indicated that the circumstances added to its "misgivings." Id. Due to its uneasiness with the evidence presented, the court ordered a new trial in the interest of justice:

> While none of the evidence heretofore reviewed
> destroys as a matter of law the credibility of the

6

state's witness, we are satisfied that there are so many circumstances casting doubt upon the story of complaining witnesses, and that the evidence so strongly preponderates against her story, that there is good ground to conclude that justice has probably miscarried. In view of this conclusion, we deem it proper, in the exercise of authority conferred by sec. 251.09 Stats. [subsequently renumbered as Wis. Stat. § 751.06], to order a new trial.

Id. at 13.

¶62 The cases described above are but a sample of the many decisions granting reversal in the interest of justice based solely on a reassessment of the evidence. See, e.g., Kemp v. State, 61 Wis. 2d 125, 137, 211 N.W.2d 793 (1973) (granting new trial in the interest of justice because evidence as a whole predominated on Kemp's side); Combs v. Peters, 23 Wis. 2d 629, 129 N.W.2d 174 (1964) (given the evidence of record tending to show that the defendant was the offending driver, court determined that the jury finding to the contrary was probably a miscarriage of justice, reversed the judgment, and remanded for a new trial); Schuh v. State, 221 Wis. 180, 183, 266 N.W. 234 (1936) (reversing in the interest of justice where the circumstances under which the alleged act took place were "inherently improbable"); Jacobson v. State, 205 Wis. 304, 309-10, 237 N.W. 142 (1931) (determining that "it is probable that justice has been miscarried" when the evidence in a bastardy case "indicate[d] very strongly" that the defendant was not the child's father); Paladino v. State, 187 Wis. 605, 606, 205 N.W. 320 (1925) (determining that despite the lack of errors, the case against defendant was very "doubtful" and defendant should have the opportunity to present the case to another jury); State

7

v. Murdock, 2000 WI App 170, ¶¶40, 45, 238 Wis. 2d 301, 617 N.W.2d 175 (ordering new trial in the interest of justice because, considering the evidence presented at trial, there was a substantial probability that a new trial would produce a different result).

¶63 Although the majority does acknowledge Kemp and attempts to distinguish it on the facts, it misses that Kemp did the very thing that the majority now states is prohibited: it reversed in the interest of justice based on a reassessment of the evidence. The failure to address this aspect of Kemp, as well as numerous other cases taking the approach that it now disavows, greatly undermines the majority opinion.

II

¶64 In contrast to the majority, I conclude that the court of appeals' decision to reverse in the interest of justice should be upheld. Its decision to reverse in the interest of justice is an exercise of discretion entitled to a deferential standard of review. This court "will uphold the discretion of a court [it is] reviewing if the decision made on appropriate facts and the correct law is one which a court reasonably could have reached." McConnohie, 113 Wis. 2d at 370. Here, the court of appeals' discretionary decision was based on appropriate facts and the correct law, and was a decision that a court could reasonably reach.

¶65 The court of appeals' decision accurately recited the following facts of this case. State v. Kucharski, No. 2013AP557-CR, unpublished slip op. (Wis. Ct. App. May 6, 2014).

Kucharski, charged with two counts of first degree intentional homicide, pled not guilty by reason of mental defect. <u>Id.</u>, ¶3. He asserted that he began having hallucinations and hearing voices in 2005. <u>Id.</u>, ¶6. Shortly thereafter, he moved in with his parents and became very isolated. <u>Id.</u>, ¶¶6-7. The voices continued, making derogatory remarks and commanding Kucharski to do things. <u>Id.</u>, ¶8. In 2009, he began keeping a journal to help him sort out what the voices meant. <u>Id.</u>, ¶11. By 2010, this journal consisted of 40-50 pages of notes and diagrams. <u>Id.</u>

¶66 On the day he killed his parents, the voices told Kucharski to "simply end it." <u>Id.</u>, ¶12. He intended to follow their directives by killing his parents and then killing himself in a shoot-out with the police. <u>Id.</u>, ¶13. However, by the time the police arrived, he forgot to have the shootout. <u>Id.</u>, ¶14.

¶67 Kucharski presented the reports of two psychiatrists to support his defense. Both opined that he was suffering from schizophrenia at the time he killed his parents. <u>Id.</u>, ¶15. One determined that Kucharski lacked substantial capacity to appreciate the wrongfulness of his actions. <u>Id.</u> Similarly, the other determined that he lacked the capacity to appreciate the wrongfulness of his actions and to conform his behavior to the requirements of the law. <u>Id.</u>

¶68 The psychiatrists based their opinions on interviews with Kucharski, his actions on the day of the incident, recordings of his 911 call shortly after the incident, his responses on the SIRS-II test (which is used to detect feigning

9

or exaggeration of mental illness), his journal, clinical observations by a psychologist, and information from police reports. Id., ¶¶17-25. Kucharski also presented the report of a psychologist, who indicated that he would not have a different conclusion regarding Kucharski's mental responsibility. Id., ¶15.

¶69 After reciting the above facts, the court of appeals correctly described the governing law for this case, Wis. Stat. § 752.35, which permits the court of appeals to reverse in the interest of justice when "it is probable that justice has for any reason miscarried." Id., ¶32. It acknowledged that it may conclude that justice has miscarried if there is a substantial probability of a different result on retrial. Id., ¶33. It also acknowledged that it may exercise its discretion only in exceptional cases. Id.

¶70 Reasonably applying this law to the facts of the case, the court of appeals determined that the evidence "'predominates quite heavily on the side of the defendant on the issue of his mental responsibility,' and that, consequently, 'justice has miscarried and . . . a new trial will probably bring a different result.'" Id., ¶44 (quoting Kemp, 61 Wis. 2d at 138). It observed that Kucharski was suffering from schizophrenia when he killed his parents; the expert evidence supporting his defense was uncontroverted; and there was a complete lack of evidence of alternative explanations for Kucharski's behavior. Id., ¶¶36-41.

¶71   The court of appeals' analysis is consistent with a long line of cases permitting courts to reverse in the interest of justice based on a reassessment of the evidence.  See supra, ¶¶12-15.   This court should be hesitant to cabin that discretion.

¶72   Rather than creating a new rule of law that limits the discretionary powers of reviewing courts, I would apply well established existing precedent and give deference to the court of appeals discretionary decision.   Because the court of appeals' exercise of its discretion was based on appropriate facts and the correct law, and was a decision that a reasonable court could make, it was not erroneously exercised and should be upheld.  Accordingly, I respectfully dissent.

¶73  I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.